UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE

United States of America

    v.                                      Criminal No. 05-cr-059-01-JD
                                                Opinion No. 2005 DNH 140
Dervon Benedict

O R D E R

Dervon Benedict has moved to suppress evidence allegedly seized from his person during his warrantless arrest on the ground that it was not supported by probable cause.[1] The government objects to suppression. The court held an evidentiary hearing on the motion on September 8, 2005.

Background

The court makes the following findings of fact based on the testimony of Officer Matthew A. Nelson, his investigative report, and his fellow officer's affidavit made in support of a warrant to search Benedict's vehicle following his arrest. Although Benedict also submitted an audiotape of certain telephone conversations he had prior to his arrest, the poor quality of the recording made it largely unintelligible when played at the

---

[1] Benedict also moves to suppress a brief comment he allegedly made to the arresting officers.

hearing.  The tape therefore has little evidentiary value, though the court has considered it to the extent possible.

In June 2004, the Concord, New Hampshire, Police Department received a tip from a confidential informant ("CI No. 1") that an Hispanic male known as "D" regularly traveled to the city to ply crack cocaine, arriving on Thursday night and leaving on Saturday night or Sunday morning after his supply ran out.  CI No. 1 added that D, who lived in the Boston area, drove a beige Cadillac and, while in Concord, stayed with a woman named Heidi Rowell on Pierce Street.  Around that time, the police saw a beige Cadillac with Massachusetts plates parked around the corner from Rowell's residence.  A check on the plates revealed that the car was registered to the defendant.

In November, 2004, "D" was identified to the Concord Police by a second confidential informant ("CI No. 2") as Dervon Benedict, a "big time dealer" of crack.  CI No. 2 said that Benedict typically arrived in Concord around 7 p.m. each Thursday and stayed until his supply was exhausted, usually on Saturday, when he returned to the Boston area.  According to this informant, Benedict generally brought about five hundred rocks, which he sold for $50 or $100 each, and stayed with Heidi Rowell on Pierce Street.  CI No. 2 also gave what he remembered to be Benedict's cellphone number and described his vehicle as a dark

green four-door sedan.  Checking on this last piece of information, the police learned that a green four-door Toyota Avalon was registered to Benedict in Massachusetts.

A third confidential informant on Benedict's alleged activities emerged when the Concord police arrested a man for selling prescription pills in Concord.  This man ("CI No. 3"), an admitted crack user, told Nelson on February 16, 2005, that Dervon Benedict or "D" would be arriving at the residence of CI No. 3 the next day to deliver the drug for him to sell in Concord.  CI No. 3 added that Benedict had two vehicles, a champagne-colored Cadillac and a green Toyota, but that he sometimes used CI No. 3's car, which had New Hampshire plates, while delivering drugs in Concord in an attempt to avoid the suspicion Benedict thought his own Massachusetts plates would attract.  CI No. 3 said that Benedict sold half-gram rocks for $50 each and gram rocks for $100 each, keeping his wares in the front waistband or crotch of his pants.  Like the other informants, CI No. 3 related that Benedict traveled to Concord from the Boston area every Thursday to conduct these sales.

CI No. 3 also knew that Benedict's cellphone number was (617) 816-4894--one digit off from the number given by CI No. 2. Nelson acknowledged in his testimony at the suppression hearing that he does not know one way or the other about any prior

relationship among the informants.  At any rate, with CI No. 3's assent and authorization from the county attorney, Nelson proceeded to monitor and record CI No. 3's call to Benedict around 11 p.m. on November 16.  Again, although the tape of this conversation is unclear, Nelson recalls that Benedict said he was "getting the shit together" and would arrive on Thursday around 2 p.m.  Nelson understood this to mean that Benedict was preparing the crack to bring to Concord at that time.  Based on his review of the tape, however, Benedict's counsel says that his client had also mentioned "trying to get the girls together," to which CI No. 3 replied, "You always say that, man."  Benedict therefore argues that "while one might infer that the conversation was about drugs, one might just as easily infer that it was not."

The next morning, with Nelson and another officer listening pursuant to further authorization from the county attorney, CI No. 3 made several calls to Benedict's number.  Although the informant's first attempts reached only an answering machine, which played a message indicating that the caller had reached D, CI No. 3 eventually spoke to Benedict at 11:40 a.m.  According to Nelson, Benedict said that he planned to "get the shit together" and leave for Allenstown, New Hampshire, not far from Concord, around 2 p.m. that day.  Benedict's lawyer, however, believes based on his review of the tape that his client might have

4

actually used the less suspicious expression "get <u>my</u> shit together," as in "get my act together" as one would before leaving on any trip.  Benedict added that he would not be driving the Cadillac, because he wanted to avoid putting additional miles on it before he tried to sell it.  The police inferred that Benedict would be driving the Avalon instead.

 The Concord police contacted their counterparts in Boston, who provided a photograph of Benedict from his January 25, 2005,arrest there on an assault charge.  Nelson and other law enforcement officers then set up surveillance near the spot in Allenstown where Benedict had said he was headed.  At around 3:30 p.m., one of the officers saw a green Avalon bearing the plates registered to Benedict with a man matching his booking photo behind the wheel.  The police stopped the vehicle, arrested the driver, and during the incident search found two large plastic bags containing a number of individually packaged white rock-like objects in the waistband and crotch of his pants.  The driver, identified as Benedict, was taken into custody; the vehicle was impounded.  Testing revealed the rocks to be crack cocaine.

Discussion

 "A warrantless arrest of an individual in a public place for a felony . . . is consistent with the Fourth Amendment if the

arrest is supported by probable cause." Maryland v. Pringle, 540 U.S. 366, 370 (2003). As Benedict recognizes, "'[p]robable cause exists when the facts and circumstances within the police officers' knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent person in believing that the defendant had committed or was committing an offense.'" Mot. Suppress ¶ 10 (quoting United States v. Fiasconaro, 315 F.3d 28, 34-35 (1st Cir. 2002)) (further internal quotation marks and bracketing omitted). Whether probable cause exists depends on the totality of these circumstances. Pringle, 540 U.S. at 371 (citing Illinois v. Gates, 462 U.S. 213, 232 (1983)); see also, e.g., Fiasconaro, 315 F.3d at 35.

Where the information in question came from one or more confidential informants, the First Circuit has assembled a non-exhaustive list of factors to consider in evaluating probable cause, including the informants' apparent veracity or basis of knowledge, whether their statements are self-authenticating, the extent to which their statements were corroborated where reasonable and practicable, and any professional assessment of the probable significance of their statements made by the law enforcement officers in question. United States v. Zayas-Diaz, 95 F.3d 105, 111 (1st Cir. 1996); see also, e.g., United States v. Capozzi, 347 F.3d 327, 333 (1st Cir. 2003); United States v.

Barnard, 299 F.3d 90, 93 (1st Cir. 2002).  "'None of these factors is indispensable;' the ultimate issue is whether the totality of the circumstances establishes the credibility of the informant's story."  Capozzi, 347 F.3d at 333 (quoting Zayas-Diaz, 95 F.3d at 111).

    Benedict argues that the circumstances here fail to show that the information provided by the confidential informants was, in fact, credible, particularly because it lacked sufficient detail to be considered self-authenticating and was not corroborated by independent police investigation in any significant respect.  The court disagrees.  First, rather than simply identifying Benedict as a drug dealer, each of the informants provided specific facts about Benedict's activities, including the schedule on which he visited Concord from Boston to sell crack, the vehicle he drove, and, in the case of CI No. 1 and CI No. 2, even the full name of the person he stayed with in Concord and the street where she lived.  Furthermore, CI No. 2 and CI No. 3 specified the prices and quantities of the drugs which Benedict peddled.  The informants' credibility was therefore "bolstered by the detail [they] provided about [Benedict's] criminal activities."  United States v. Strother, 318 F.3d 64, 68 (1st Cir. 2003); see also United States v. Taylor, 985 F.2d 3, 6 & n.1 (1st Cir. 1993) (noting that

providing names and dates supports informant's credibility).

This level of detail also undermines Benedict's suggestion that the informants' accounts were not necessarily based on their personal knowledge because Nelson's report does not specifically reference that fact. Indeed, any fair construction of the information garnered from CI No. 3 leads to the opposite conclusion. Not only did this informant claim that he had provided his vehicle to Benedict for the purpose of delivering drugs, but CI No. 3 also knew Benedict's phone number and the precise date and approximate time when he would next be arriving in the Concord area.[2] Moreover, CI No. 3 was able to engage Benedict in two separate conversations where he discussed his immediate plans in detail, right down to his decision to forego mileage on his Cadillac in hopes of selling it.[3]

These facts indicate that CI No. 3's knowledge of Benedict's illegal activities was based on CI No. 3's participation in those activities, rather than any intermediate source, and therefore

---

[2] CI No. 2 also thought he knew Benedict's phone number, missing by only one digit. This suggests that CI No. 2 also had prior dealings with Benedict.

[3] Benedict has not directed the court's attention to any exchange during these conversations suggesting that he did not readily recognize the caller. Indeed, according to Benedict, his comment about "getting the girls together" caused CI No. 3 to remark, "You always say that, man," suggesting that the two had talked about the subject often.

supports his credibility.  "A specific, first-hand account of possible criminal activity is a hallmark of a credible tip." United States v. Greenburg, 410 F.3d 63, 67 (1st Cir. 2005); see also Barnard, 299 F.3d at 94 ("The credibility of an informant is enhanced to the extent he has provided information that indicates first-hand knowledge," particularly of "concealed illegal activity as opposed to easily knowable, nonincriminating facts"). Furthermore, CI No. 3, whom the police had arrested for his own drug dealing, implicated himself in further criminal activity through the information he gave about Benedict.  Courts have recognized such circumstances as tending to support the informant's credibility, given the disincentive to falsely incriminate oneself.  See, e.g., United States v. Harris, 403 U.S. 573, 583-84 (1971); United States v. Schaefer, 87 F.3d 562, 566 (1st Cir. 1996) (citing cases).

Benedict, of course, points out that neither of his recorded conversations with CI No. 3 specifically referenced drugs, suggesting that the men could just as easily have been making plans involving women or some other ostensibly innocent pursuit. This reading, however, ignores everything else the police had heard about Benedict, both from CI No. 3 and the other informants, at the time of those calls.  All of these sources said that Benedict routinely traveled to Concord with a sizeable

quantity of crack every Thursday.  In light of this information, it was reasonable to understand Benedict's statements about "getting . . . shit together" for his arrival in the Concord area on Thursday afternoon to refer to the crack he regularly brought with him.[4]  After all, "the probable cause standard is a 'practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'"  Pringle, 540 U.S. at 799 (quoting Gates, 462 U.S. at 231) (further internal quotation marks omitted).  Furthermore, the police were entitled to interpret Benedict's comments in light of their experience investigating drug crimes, see, e.g., Barnard, 299 F.3d at 94, which, as Nelson testified at the suppression hearing, had taught them that "getting the shit together" can serve as code for readying drugs for sale.

In a similar vein, Benedict argues that the information actually corroborated by the police through independent investigation consisted only of unremarkable details, such as his ownership of vehicles meeting the description provided by the informants and his parking near Rowell's residence in Concord.

---

[4] For this reason, Benedict's suggestion that he actually used the phrase "get my shit together" makes no difference to the probable cause analysis.

10

But even "[c]orroboration of innocent activity can establish the reliability of the informant because the activity might come to appear suspicious in light of the initial tip." Greenburg, 410 F.3d at 69 (citing Gates, 462 U.S. at 243 n.13). Thus, while the presence of Benedict's car near Rowell's home did not in and of itself indicate criminal activity, it confirmed part of the stories of CI No. 1 and CI No. 2 that Benedict regularly stayed with Rowell after he drove to Concord to sell crack. See id. (finding error in court's conclusion that agent's mere observation of trucks entering and leaving defendant's facility, at time identified by informant as next scheduled fraudulent repackaging of delivered meat, failed to corroborate informant's story); accord Gates, 462 U.S. at 243-44.

In any event, Benedict's argument in this regard ignores the fact that "consistency between the reports of two independent informants helps to validate both accounts." Schaefer, 87 F.3d at 566. Here, among other similarities, all three informants gave virtually identical accounts of Benedict's schedule, two provided similar descriptions of each of his two vehicles, and CI No. 1 and CI No. 2 both mentioned Rowell by name and street. The informants' stories therefore served to corroborate each other.

Finally, while Benedict faults the police for not resorting to other investigative techniques, such as continued surveillance

or a controlled buy, to attempt to confirm the informants' accounts, the circuit has answered a similar argument with the reminder that the authorities need corroborate tips only insofar as it is "'reasonable and practicable'" to do so.  Greenburg, 410 F.3d at 69 n.3 (quoting Zayas-Diaz, 95 F.3d at 111).  As Nelson testified at the hearing, because CI No. 3 told police on February 16 that Benedict would be traveling to the Concord area with a quantity of crack the very next day, there was insufficient time to set up a controlled buy or otherwise try to confirm that Benedict was in possession of the drugs as the informant had claimed.  The police therefore corroborated the informants' tips to a reasonable and practicable extent given the circumstances of the investigation.

   In any event, whether the authorities properly corroborated an informant's story through their own efforts is but one of the factors which goes into the credibility assessment.  E.g., Capozzi, 347 F.3d at 333.  Even if the police should have done more by way of independent investigation, then, it does not follow that the informants' accounts were not credible, particularly in light of the other factors already discussed.  The same is true with regard to Benedict's suggestion that the informants could not have been credible because they had not provided reliable information in the past.  See, e.g., Greenburg,

410 F.3d at 67; Barnard, 299 F.3d at 94.  Based on the totality of the circumstances, the court concludes that the informants' accounts of Benedict's illegal activities were credible.

Given this conclusion, the court also rules that the police had probable cause to believe that Benedict was in possession of more than five grams of cocaine base, a felony, see 21 U.S.C. § 844(a), at the time of his arrest.  The police had information from all the informants that Benedict regularly traveled to the Concord area on Thursdays with a large quantity of crack to sell.  Moreover, CI No. 3 told the authorities that Benedict planned to come to the area to provide him with crack on the day Benedict was ultimately arrested, and confirmed those plans through two calls where details of the meeting, such as the time and the car he would be driving, were discussed.  During these calls, the police themselves understood Benedict to say that he would head to the Concord area after preparing the drugs for sale.  This information was adequate to furnish probable cause to arrest Benedict when the police saw him driving his Avalon toward the appointed meeting place on November 17.  See, e.g., United States v. Link, 238 F.3d 106, 109-111 (1st Cir. 2001).

<u>Conclusion</u>

For the foregoing reasons, Benedict's motion to suppress (document no. 10) is DENIED.

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
United States District Judge

October 6, 2005

cc:  Jonathan Saxe, Esquire
     Clyde R.W. Garrigan, Esquire
     U.S. Probation
     U.S. Marshal